IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| HALLY AND MARY HAWORTH, | Civ. No. 09-1241-AC |
| Plaintiffs, | FINDINGS AND RECOMMENDATION |
| v. | |
| CITY OF FOREST GROVE, a municipal subdivision of the State of Oregon; RICHARD G. KIDD, III, in his official capacity; PETER TRUAX, in his official capacity; VICTORIA LOWE, in her official capacity; RONALD THOMPSON, in his official capacity; THOMAS JOHNSTON, in his official capacity; ELENA UHING, in her official capacity; CAMILLE MILLER, in her official capacity; DEENA BARRETT, in her official capacity; MICHAEL J. SYKES, in his official capacity; PAUL DOWNEY, in his official capacity, | |
| Defendants. | |

_____
ACOSTA, Magistrate Judge:

## Introduction

This disposition concerns cross motions for summary judgment.  Plaintiffs Hally and Mary Haworth ("the Haworths") seek partial summary judgment against Defendants City of Forest Grove ("the City"), Richard G. Kidd, III ("Mayor Kidd"), and Michael J. Sykes ("Sykes") (collectively "Defendants") on all claims under 42 U.S.C. § 1983 ("section 1983"), and for intentional interference with prospective business advantage and inverse condemnation.  Defendants seek summary judgment on all claims.

For the reasons stated below, the Haworths' motion for summary judgment should be denied in its entirety.  Defendants' motion should be granted as to the claims for denial of access to courts, procedural due process, intentional interference with prospective business advantage, private nuisance, and wrongful initiation of civil proceedings.  Defendants' motion for summary judgment as to the substantive due process and inverse condemnation claims should be denied.

## Factual Background

The property in question ("the subject property") is a 140-acre parcel previously owned by the Zurcher trust.  The Haworths purchased this property for $1.55 million[1] on August 10, 2005, intending, at least in part, "to use the property in their nursery operation."  (Plaintiff's CSMF ¶ 8, 10.)  Hally Haworth testified that this was their sole intention for the subject property and Paul Downey confirmed that Hally Haworth had communicated this to the City. (Haworth Depo. 27:9-13;

_____

[1]  The purchase price was actually listed as $1.65 million, but the Haworths received an additional $100,000 credit on the purchase because buildings on the property were in need of extensive repair.  (Def.'s CSMF ¶ 3.)

Downey Depo. 27:21-28:1.)  Prior to this, the City had made an offer on the subject property but the seller rejected this offer.  (Pl.'s CSMF ¶ 9.)  Before the Haworths officially closed on the subject property, Hally Haworth and Tom Vanderzanden ("Vanderzanden"), a consultant with a background in planning who was assisting the Haworths with the negotiations, met with Sykes, the City manager, to discuss the possibility of selling the subject property to the City.  (Lerner Aff., Ex. A at 111:2-10.) "Sykes found that Haworth and Vanderzanden were open to discussing the sale of the property to the City."  (Def.'s CSMF ¶ 4.)

On August 16, 2005, the same day that Haworth and Vanderzanden met with Sykes, the City Council met in "executive session pursuant to ORS 192.660(2)(e)" and discussed acquisition of the subject property by eminent domain.  (Pl.'s CSMF ¶ 11, 14.)  At the time, the City Council was aware that the Haworths were in the nursery business and that their intention, at least in part, was to use the property as a nursery.  (Pl.'s CSMF ¶ 15-16.)  The City Council considered two proposed resolutions "expressing the City's intent to acquire the property in its entirety, all 140 acres, by condemnation."  (Pl.'s CSMF ¶ 17.)  The resolution adopted by the City Council stated:

> The purpose of acquiring the Property is to construct thereon, or on portions thereof, park and recreation facilities and to provide open space to serve the residents of the City.  Such purposes are necessary for the general health and welfare of the City, and are for the public use and benefit of the City's residents.  In addition, a portion of the property may be utilized for other public facilities or sold or leased for private development.

(Pl.'s CSMF ¶ 18.)  The other resolution, which the City did not adopt, did not include the last sentence of the adopted resolution.  (Pl.'s CSMF ¶ 19.)

A transcript of the executive session reveals the following.  At the meeting, Sykes reported that the City's attempt to purchase the subject property from the Zurchers was unsuccessful and that

the property was sold to a third party, the Haworths. He raised the possibility of condemnation, noting that the City would need to state its public purpose and that draft a resolution "that outlines a number of recreational activities that would justify [the City] proceeding with the condemnation process." (Umscheid Decl., Ex. 6 at 5.) Sykes speculated that there would then be a period of negotiation and, if no agreement was reached, the City would "initiate a 40-day process to move forward with the condemnation of the property." *Id.* at 5-6. Sykes then described a meeting he had with Hally Haworth, and their discussion regarding possible uses for the property. Sykes stated that Hally Haworth wanted to use the property for a nursery, but that they also talked about residential uses in the future. Sykes recounted the conversation:

> But as we talked, one of the things they seemed clearly interested in considering and discussing with the city was the possibility of giving us all of the property that was within the flood plain and possibility [sic] five acres or so here, maybe a little bit of this upland piece for free, in return for working with them to develop – bring the rest into the urban growth boundary.
> But I got the impression that they understood we have two pretty big hammers (inaudible). We can condemn this if we really want to. And it's something we want to discuss – this is really important to the city.

*Id.* at 8-9. Counsel for the City, Andy Jordan ("Jordan"), then presented the City Council with two versions of a condemnation resolution, one which contained a sentence permitting sale or lease for private development. The City Council went on to discuss possible uses for the property, including parks and recreation, residential, commercial, and industrial uses.

One City Council member, Tom Johnson ("Johnson"), explained that during the creation of a master plan, which took place a few years prior to the meeting in question, the City determined that it would need approximately 32 acres in new parks to keep up with projected population growth. The master plan also projected a need for approximately 82 acres of "open space and green way[,]"

and identified property across the street from the subject property as a potential park site. *Id.* at 13-14. Johnson stated:

> So all the hard work we did on this . . . the numbers kind of play out to where, you know, we can demonstrate I think, from the parks need point of view, the acreage. . . . And certainly when we look at the opportunities for expansion into large acreage pieces, you know, I think we are at least on a footing that we can demonstrate that we have a potential need in the not-too-distant future. And that's what this piece is.

*Id.* at 14. The City Council then discussed whether they could prevent the currently pending sale from taking place and the possibility that the threat of condemnation might persuade the buyer to abandon the purchase. *Id.* at 16-17.

Mayor Kidd weighed in, stating that this property seemed one of the City's "last chances" and possessed "a lot of variety and opportunity" for the City. *Id.* at 18. He supported the inclusion of a clause permitting commercial development in the event the City would want to sell some of the land. *Id.* Jordan characterized the relevant issues as whether the entire parcel should be designated as parks and recreation land, whether the resolution should include the commercial development clause, and whether a resolution should be adopted in the first place. *Id.* at 21. The City Council went on to discuss possible uses for the property, including the City's recreational needs. Mayor Kidd expressed his preference that condemnation only be used as a last resort: "It's kind of a threat, a big stick. I would much rather negotiate with them a fair price and buy the property without the condemnation if at all possible." *Id.* at 32. He also stated that he would prefer to include the commercial development provision in the resolution and pay the additional cost up front, rather than being to forced to pay additional compensation in the future. *Id.* 32-33.

During a discussion about where the City would come up with the money needed to purchase

FINDINGS AND RECOMMENDATION          5                                    {KPR}

or condemn the property, Jordan advised the City Council that the condemnation resolution would just "start[] the process. You have to do this before you go appraise and seriously negotiate a deal." *Id.* at 34. He also advised that they "c[ould] always pull out of condemnation at any given time." *Id.* A City Council member noted that if the Haworths planted nursery crops on the property, it would increase the ultimate cost of compensation. The session concluded with Jordan suggesting that the condemnation action would either result in the Haworths negotiating a "win-win" deal with the City, or having their property condemned and "wind[] up getting exactly what [they] paid for it." *Id.* at 38. The executive session was adjourned to open session for passage of the resolution.

In his declaration, Hally Haworth stated that, had he known what took place during the executive session, he would have spent less time negotiating with the City or "would not have agreed to mediation" at all. (Haworth Decl. ¶ 2.) John Holan, Forest Grove Community Development Director, subsequently authored a memorandum to Sykes, wherein he stated that, in his estimate, "there is a 60 percent chance of success to develop a park as envisioned above." (Umscheid Decl., Ex. 16 at 9.)

The parties negotiated the sale of the property to the City between August and November 2005. That fall, the City offered the Haworths $1.9 for the subject property. (Def.'s CSMF ¶ 5.) The Haworths rejected the offer, claiming that the property was worth up to $6 million. *Id.* After negotiations failed, on November 23, 2005, the City filed a condemnation action in Washington County Circuit Court. The City appraised the value of the subject property at $1.9 million, while the Haworths appraised it at $4.8 million.

Shortly after it filed the condemnation action, the City adopted a second resolution that omitted the last sentence of the first resolution, the sentence that had authorized private development.

The second resolution added the following:  "The City has determined that there is a public need to use the entire parcel for park and recreation purposes and the entire parcel is necessary for the public purposes herein described."  (Pl.'s CSMF ¶ 24.)  This resolution was adopted without further discussion. (Umscheid Decl., Ex. 11 at 8.)  In the course of litigating the condemnation action, the Haworths requested production of the tapes from the August 16, 2005, executive committee meeting, but the City refused to produce them, claiming that they were privileged.  (Pl.'s CSMF ¶ 26-27.)

The Haworths continued to make use of the subject property, though in a limited fashion. Hally Haworth testified that, in light of the City's efforts to obtain the subject property, he did not feel comfortable planting his nursery crops as he was unsure that he would have the opportunity to raise the crops to maturity or harvest them.  (Haworth Depo. 94: 25-95:9.)  He alleges that the Haworths "lost the use of the property to plant for one year[.]" (Haworth Depo. 133:10-16.) He also testified that, in 2006, they planted peach seedlings on between three and four acres; prepared a sixty-acre section of the property and planted oats on that portion; and continued to a rent a portion to an existing renter, who grew grass on it and planted and harvested twenty acres of crimson clover. He stated that, in 2006, they were "able to use the bulk of the property that was on the higher ground" for oats, which they then sold. (Lerner Aff., Ex. A at 89:6-93:17.)  Hally Haworth admitted that, although the City told him that it would be at least three years before the City took possession of the property and that he could use the property in his nursery operation, he did not believe such statements and, thus, did not feel comfortable planting his nursery crops.  *Id.* at 93:22-95:14.  Sykes testified, however, that the City "assured Mr. Haworth that [it] would work with him to allow at least three years to harvest his crops." (Sykes Decl. ¶ 9.)  Furthermore, Sykes "mentioned to Mr. Haworth that the old shacks on the property would not be of value to the City, and would eventually be torn

FINDINGS AND RECOMMENDATION          7                              {KPR}

down" but "never told Mr. Haworth that he should not make any improvements to those buildings." *Id.* at ¶ 10.  Since 2007, the Haworths have been using the property as they normally would, without regard to the condemnation action.  (Lerner Aff., Ex. A at 104:15-24.)

In November 2006, the Haworths attempted to negotiate a deal with the City wherein they would donate seventy acres of the subject property to the City, the bulk of which was located in a flood plain.  (Pl.'s CSMF ¶ 28; Lerner Aff., Ex. A at 128:14-129:10.)  A deal was not reached.  A December 5, 2006, letter authored by the Haworths reads:

> The last thing we want to make clear is our proposal made in the mediation, which we re-make to all of you.  In order to stop the fighting and nasty comments, we propose to keep 70 acres of the upland farm ground and improvements for our nursery.  We will GIVE, AT NO COST, the other 70 acres of lowland to the City for their parks, as discussed previously.  As far as we're concerned, the City can do whatever it wants with the 70 acres, as long as it doesn't detrimentally impact our nursery operations.  Also, we would like an assurance that the City of Forest Grove is willing to leave us and our nursery operation alone and let us continue our business.

(Haworth Supp. Decl., Ex. 3 at 2-3.)

The following month, the condemnation trial began.  (Pl.'s CSMF ¶ 31.)  The City was ordered to produce the audiotape of the August 16, 2005, executive session.  *Id*.  On the second day of the trial, Judge Gardner met with counsel in chambers and suggested that the parties dismiss the condemnation action, without prejudice, and attempt to resolve the dispute through mediation.  (Pl.'s CSMF ¶ 34-35.)  The parties dispute the content of the statements made by Judge Gardner in chambers that day.

The parties agreed to dismissal and a stipulated judgment of dismissal was entered by the court.  (Pl.'s CSMF ¶ 39.)  The judgment provided that if mediation was unsuccessful, the City was entitled to reinstate the case and reinstatement would be "without prejudice to either party's position

as it existed at the time of dismissal," and that "[a]ny claims for an award of costs and disbursements or attorney fees shall be incorporated into the mediation process or resolved upon reinstatement." (Umscheid Decl., Ex. 18 at 2.)  Sykes testified that, at the time the dismissal occurred, the City had concluded that a condemnation action would not be successful and had no intention of further pursuing condemnation of the subject property.  (Umscheid Decl., Ex. 16 at 17.)   Peter Truax testified that, following the dismissal of the condemnation action in December 2006, he felt that the City would probably not pursue condemnation further but did not communicate that to the Haworths because, after being "chastised by Judge Gardner," it was obvious that the City was going to "walk away from it." (Umscheid Decl., Ex. 15 at 6.)  And, at hearing on the current motion, Defendants' counsel stated that, at the time of the dismissal, it was clear to both sides that Defendants would not prevail on their condemnation action and, thus, Defendants' decision not to reinstate should not have come as a surprise to the Haworths.

After the condemnation action was dismissed, the parties chose not to pursue a mediation with Judge Gardner, and instead initiated direct settlement negotiations.  (Pl.'s CSMF ¶ 41.)  They agreed to hire the Leland Consulting Group ("Leland") to assist in the negotiations, at the suggestion of Vanderzanden.   (Pl.'s CSMF ¶ 42; Umscheid Decl., Ex. 16 at 15.)   The City budgeted approximately $40,000 to pay for Leland's services, and may have paid as much as $60,000. (Umscheid Decl., Ex. 16 at 15; Lerner Aff., Ex. A at 188:6-11.)  The Haworths' negotiating position involved, in part, a request that the City bring their property within the urban growth boundary. (Def.'s CSMF ¶ 19.)  In the fall of 2008, the City offered the Haworths $2.2 or 2.3 million for the property, at which time Hally Haworth told them he did not wish to sell.  (Lerner Aff., Ex. A at 195:19-196:1.)  Hally Haworth admitted at deposition that at no time between December 2006 and

January 2009 did he give the City a number representing an acceptable sale price of the subject property. *Id.* at 197:22-198:1.

The Haworths were informed that the City did not intend to reimburse them for the attorney fees and costs arising out of the condemnation action. (Pl.'s CSMF ¶ 46.) Sykes "represented the City in the negotiations with the Haworths" and was "acting within the scope of the authority delegated to him by the City Council." (Pl.'s CSMF ¶ 43, 48.) Sykes informed the Haworths, in a September 11, 2008, letter, that if the negotiations failed the City would not likely pursue condemnation. (Pl.'s CSMF ¶ 45.) According to the Haworths, this was the first time they had been so informed. *Id*. Sykes testified that he believed he had communicated this to the Haworths prior to the letter, but could not be sure. (Umscheid Decl., Ex. 16 at 25-26.)

Later, in January 2009, the Haworths sought to initiate the mediation process with Judge Gardner acting as the mediator, as originally contemplated, but the City did not join in the Haworth's request and informed the court of their wish that the mediation order be terminated. (Pl.'s CSMF ¶ 49; Orchard Decl., Ex. 4 at 1-2.) In February 2009, the Haworths moved to reinstate the condemnation proceedings and sought an award of abandonment damages. (Def.'s CSMF ¶ 21.) At a June 1, 2009, hearing, counsel for the Haworths stated: "I think the City has made enough of a case that some of this property could be taken. Now, whether it was properly done in this case or not, I'm reserving judgment." (Lerner Aff., Ex. G at 13:21-25.)

The condemnation action was reinstated by the court to determine the appropriate award of attorney fees and costs associated with the condemnation action. (Umscheid Decl., Ex. 1 at 1.) At the reinstatement hearing, counsel for the City stated on the record that, upon reviewing the record in the case, he had concluded that condemnation of the subject property "was not the appropriate use

of the eminent domain powers[.]" (Umscheid Decl., Ex. 17 at 12.)  The court ultimately awarded the Haworths $185,844.92 in fees and costs.  (Umscheid Decl., Ex. 1 at 3.)

The Haworths currently seek damages for lost profits from their loss of use of the subject property, which they allege resulted from the City's threat of condemnation.

*Legal Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2011).  Summary judgment is not proper if material factual issues exist for trial.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  *Id*. at 324.  A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements.  *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party.  *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982).  All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party.  *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).  Where different ultimate inferences may be drawn,

summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (2008) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

*Discussion*

I.     Section 1983 – Substantive Due Process

The Haworths allege that Defendants acted unconstitutionally in several ways: in initiating the condemnation action; in failing to adequately train employees on eminent domain; for conduct subsequent to the dismissal, specifically that of Sykes; and for testimony given by Mayor Kidd at the condemnation hearing. Defendants respond that their initiation and subsequent abandonment of the condemnation action were supported by public policy concerns and that the threat of condemnation is a risk inherent to property ownership.

A.     *Issue Preclusion*

As a threshold matter, the Haworths seek summary judgment on the ground that the state court's judgment establishes that Defendants' conduct was improper and unjustified, and that they had no objectively reasonable basis to initiate or prosecute the condemnation action. In finding that the Haworths were entitled to costs and attorney fees, the court also established that Defendants'

actions were unreasonable, which the Haworths maintain is sufficient to meet the standard for a

substantive due process violation.  Defendants respond that the general judgment, issued by the court

on June 15, 2009, does not have the preclusive effect asserted by the Haworths.

> Under Oregon law, issue preclusion applies where the following requirements are met:
>
> (1) The issue in the two proceedings must be identical.  (2) The issue must have been actually litigated and essential to a final decision on the merits in the prior proceeding.  (3) The party sought to be precluded had a full and fair opportunity to be heard.  (4) The party sought to be precluded was a party or was in privity with a party in the prior proceeding.  (5) The prior proceeding was the type of proceeding to which a court will give preclusive effect.

*Lawrence v. Clackamas County*, 180 Or. App. 495, 503, 43 P.3d 1192 (2002) (citing *Nelson v.*

*Emerald People's Utility Dist.*, 318 Or. 99, 104, 862 P.2d 1293 (1993)).

> The judgment in question, entered on June 16, 2009, states, in relevant part:
>
> [The Haworths] shall be awarded their reasonable attorneys' fees relating to these proceedings . . . pursuant to ORS 35.355 and ORS 20.105, the Court having previously found in its March 16, 2009 Order that [the City] has abandoned its condemnation of [the Haworths'] property and further, that [the City] stated to the Court on February 23, 2009 that its 2005 condemnation of [the Haworths'] property was an improper and unjustified use of [the City's] eminent domain authority.

(Umscheid Decl., Ex. 1 at 2.)  The Haworths point to the court's dual reasons for awarding fees, that

the condemnation was abandoned and that the City admitted the condemnation was improper and

unjustified, as conclusive proof that the condemnation action violated their substantive due process

rights.

> The judgment itself relies on Oregon Revised Statutes ("ORS") 20.105 and 35.355.  ORS

20.105 provides that a prevailing party against whom a claim is brought is entitled to reasonable

attorney fees "to be paid by the party asserting the claim, defense or ground, upon a finding by the

court that the party willfully disobeyed a court order or that there was not objectively reasonable

basis for asserting the claim, defense or ground for appeal." OR. REV. STAT. 20.105(1) (2009). Thus, in awarding attorney fees pursuant to the statute, the court concluded that the condemnation action was not objectively reasonable. ORS 35.355 provides that if a property owner prevails in a condemnation action, their costs "including a reasonable attorney fee to be fixed by the court, shall be taxed by the clerk and recovered from the condemner." OR. REV. STAT. 35.355 (2009).

Defendants argue that the court's finding that the condemnation was improper and unjustified, as expressed in the judgment in question, is distinct from a finding that a constitutional violation has occurred. Defendants cite *Samson v. City of Bainbridge Island*, 683 F. Supp. 2d 1164 (W.D. Wash. 2010), wherein the district court examined a prior a Washington State court decision involving the same parties. The district court observed that the state case had held that the challenged moratoria on development were invalid but, the district court noted, with regard to issue preclusion, such a finding "[did] not direct the court to any other findings or conclusions. To assume that the invalidity of the moratoria equal[ed] a federal constitutional violation would work an injustice on defendant." *Id.* at 1173. Unless the issue preclusion factors are met, the court cannot impute greater meaning on a lower court's finding that a governmental action was improper.

The Haworths argument fails to satisfy several of the relevant factors. First, the issue before the state court was not identical to the issue currently before this court. The standard for a violation of substantive due process right is specific and presents a high burden for a plaintiff. That a court deemed the City's condemnation action improper and unjustified, or lacking a reasonable basis, may weigh in favor of finding such a violation, but it does not conclusively establish a constitutional violation. Second, the issue was not litigated before the state court. The condemnation action was abandoned before it was actually adjudicated and it involved no claim of a constitutional violation

of substantive due process rights. The issue simply was not before the state court, nor was it litigated. Third, because the issue was not litigated, it follows that the City had no opportunity to be fully and fairly heard on this issue, and the Haworths fail on this factor as well. For these reasons, issue preclusion does not apply.

B.    *Admissions by the City*

The Haworths next argue that the City admitted that the condemnation was improper and unjustified and are estopped from arguing to the contrary in this proceeding. They cite statements made by attorneys for the City on February 23, 2009, and June 1, 2009, as admissions that condemnation was improper. Specifically, one attorney stated that the condemnation was abandoned because the City "saw that it was not the appropriate use of the eminent domain powers . . . ." (Umscheid Decl., Ex. 17 at 12:7-9.) Another attorney later stated that the condemnation action was abandoned because "there was no public purpose for the taking of that amount of land." (Umscheid Decl., Ex. 19 at 7:25-8:1.) Defendants counter the Haworth's characterization and argue that the attorneys merely admitted that the City would have difficulty condemning the whole parcel and not that it wholly lacked a legitimate public purpose.

Again, while the statements made by the City's counsel at hearing may qualify as admissions as to the propriety of the condemnation action, they do not amount to admissions of a constitutional violation sufficient to meet the standard for a substantive due process claim. The Haworths' argument thus fails on this point.

C.    *Constitutional Violation*

"Local government entities are considered 'persons' for purposes of § 1983 and can be sued directly for monetary, declaratory, or injunctive relief where 'the action that is alleged to be

unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers.'" *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006) (quoting *Monell v. Dep't of Soc. Servs. of New York City*, 436 U.S. 658, 690 (1978)). "Generally, a municipality is liable under *Monell* only if a municipal policy or custom was the 'moving force' behind the constitutional violation. In other words, there must be 'a direct causal link between an municipal policy or custom and the alleged constitutional deprivation.'" *Villegas v. Gilroy Garlic Festival*, 541 F.3d 950, 957 (9th Cir. 2008) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

And, though a local government may not be held liable under section 1983 on a respondeat superior theory, it may be held liable for the acts of its officials or employees under specific circumstances. *Anderson*, 451 F.3d at 1070. Liability may arise in three scenarios. "First, a local government may be held liable 'when implementation of its official policies or established customs inflicts the constitutional injury.'" *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 708 (1978). "Second, under certain circumstances, a local government may be held liable under § 1983 for acts of 'omission' when such omissions amount to the local government's own official policy." *Clouthier*, at 1249 (citing *Cabrales v. County of Los Angeles*, 864 F.2d 1454, 1461 (9th Cir. 1988)). Again, this omission must meet the standard for deliberate indifference. *Id.* "Third, a local government may be held liable under § 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Clouthier*, at 1250 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992)). Where it has been established that one of the

three scenarios is present, "a plaintiff must also show that the circumstance was (1) the cause in fact and (2) the proximate cause of the constitutional deprivation." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citing *Arnold v. International Business Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981)).

Where the constitutional injury alleged is a violation of substantive due process, the plaintiff must allege both a "'deprivation of life, liberty, or property[,]'" and a "level of executive abuse of power as that which shocks the conscience." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (quoting *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 948 (9th Cir. 2004), and citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  Whether the conduct in question shocks the conscience "depends on the context[,]" and may be impacted by the degree of deliberation possible prior to the allegedly unlawful behavior.  *Tennison v. City & County of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009).  *See also County of Sacramento*, 523 U.S. at 850 ("Rules of due process are not, however, subject to mechanical application in unfamiliar territory . . . and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking.").

Defendants argue that the rights asserted by the Haworths are not fundamental rights and are thus afforded lesser protection.  The Ninth Circuit has held that economic and property rights are not fundamental rights and are thus subject to a lower degree of scrutiny.  *See Dodge v. Johnson*, 41 Fed. Appx. 138, 139 (9th Cir. July 12, 2002) (citing *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 n.4 (9th Cir. 1998)). Typically, "the protection from governmental action provided by substantive due process has most often been reserved for the vindication of fundamental rights." *Halverson v. Skagit County*, 42 F.3d 1257, 1261 (9th Cir. 1994).  Where fundamental rights are not at issue, the

government action is "presumed valid, and this presumption is overcome only by a 'clear showing of arbitrariness and irrationality.'"  *Kawaoka v. The City of Arroyo Grande*, 17 F.3d 1227 (9th Cir. 1994), *cert. denied*, 513 U.S. 870 (1994)).  Thus, where a plaintiff alleges a "governmental action that does not impinge on fundamental rights, 'we do not require that the government's action actually advance its stated purposes, but merely look to see whether the government *could* have had a legitimate reason for acting as it did.'"  *Halverson*, 42 F.3d at 1262 (quoting *Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 66 (9th Cir. 1994)).  And, unlike analysis in the takings context, "the rationality of the government action" controls, and the court need not balance the public interest against the impact on the private party. *Id.* (quoting *Kawaoka*, 17 F.3d at 1238).

The Haworths argue that, even if the judgment and admissions by the City are not conclusive proof of a violation, the City's conduct itself was unconstitutional in nature.  The Haworths argue that the audiotape of the executive session of the City Council and the City's failure to produce it was unlawful because the tape reveals that no public need existed, that no condemnation analysis was ever conducted, and that the City only wished to keep its options open for the future.  This, the Haworths contend, allowed the condemnation action to proceed far further than it would have had the tapes been disclosed in a timely fashion and the City's true intentions revealed.  In failing to so disclose, the City allowed the presumption to arise that there was a true public need to justify the condemnation action.  The Haworths describe further ways in which the City unnecessarily and unjustly delayed the process:  the City rejected the Haworths' offer to donate seventy acres only to later abandon the condemnation entirely; the City failed to inform them that it had no intention of reinstating the condemnation action and allowed the charade of mediation to continue; and the City disputed the Haworths' entitlement to attorney fees despite clear language in the stipulated judgment

FINDINGS AND RECOMMENDATION        18                              {KPR}

that the issue would be resolved in a future proceeding.

The City disputes the Haworths' characterization of its conduct. First, the City had a legitimate public purpose for the Haworths' property, namely a need for recreational space, and the executive session transcript reflects this need and discussion of this need. Second, the City refused to produce the tapes because of their privileged content. Third, the Haworths' offer to donate seventy acres was not an outright donation, but part of a larger deal that the City legitimately objected to making. Fourth, the City did not conceal its intent to abandon the reinstatement action as there was no formal decision until September 2008 and, further, the City made several good faith offers on the subject property in the interim. Finally, the City maintains that its opposition to reinstatement of the condemnation action for purposes of analyzing attorney fees has a reasonable basis and, further, that any position it took in that proceeding is privileged.

The court agrees that the City's conduct does not entitle the Haworths to summary judgment on this claim. On the evidentiary record before it, the court cannot conclude that a reasonable fact finder could only conclude that the City's actions were clearly arbitrary and irrational. The Haworths' motion for summary judgment on their substantive due process claim should be denied.

By the same token, the court cannot conclude that Defendants' actions in condemning the Haworths' property were rational or taken in good faith. The record evidence, in particular the content of the executive session, raises at least a genuine issue of material fact that, at best, the City failed to properly evaluate the condemnation of the Haworths' property and, at worst, that the City wholly lacked a public purpose and was merely keeping its options open or that it initiated condemnation proceedings to coerce the Haworths into acting in its interest. Thus, Defendants' motion for summary judgment on this claim should also be denied.

FINDINGS AND RECOMMENDATION          19                                    {KPR}

II.  Section 1983 – Procedural Due Process

Defendants move for summary judgment on the Haworths' section 1983 procedural due process claim.  "A section 1983 claim based upon procedural due process . . . has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process."  *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).  The Supreme Court has stated that "where a deprivation of property is the 'result of a random and unauthorized act by a state employee,' meaningful predeprivation process is not possible, and that due process requirements may therefore be satisfied by adequate post-deprivation procedures for obtaining a remedy."  *Soranno's Gasco v. Morgan*, 874 F.2d 1310, 1317 (9th Cir. 1989) (quoting *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986) (internal citation omitted)).

The Haworths' procedural due process claim is premised on Defendants' misuse of the executive session and their subsequent failure to produce evidence relating to the content of the executive session until after the conclusion of the condemnation action.  Thus, the Haworths contend, they were prevented from fully litigating the City's condemnation action and, thus, from seeking full compensation for their resulting injuries.

It is undisputed that the City Council adopted a resolution and the City initiated condemnation proceedings in their effort to gain ownership of the subject property.  And while the Haworths dispute the propriety of these actions, there is uncontroverted evidence that the City engaged in meaningful, though potentially flawed, process prior to exercising its power of eminent domain.  Further, the Haworths fail to clearly articulate the property interest of which they have been deprived.  In fact, the condemnation action did not result in deprivation of a property interest, except

to the extent that its pendency may have unreasonably deprived them of the full use and value of their property for a period of time, which damages are currently the subject of litigation in the present case.

The Haworths have failed to create an issue of fact as to whether they were deprived of process.  The record establishes that they were not and, thus, Defendants' motion for summary judgment on this claim should be denied.

III.    Section 1983 – Denial of Access to Courts

Claims of denial of access to courts based on the First Amendment fall into two categories. The first category is for cases wherein a "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time." *Christopher v. Harbury*, 536 U.S. 403, 413 (2002).  The second is for cases "that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." *Id.* at 413-14.  These situations may result from "the loss or inadequate settlement of a meritorious case, . . . the loss of an opportunity to sue, . . . or the loss of an opportunity to seek some particular order of relief . . . ." *Id.* at 414.  Such claims must identify both the underlying claim, i.e., the claim whose appropriate resolution was frustrated by the official action, and the remedy that will provide the needed relief.  *Id.* at 414-415.

The Haworths claim that, in concealing the lack of a public necessity for the condemnation action and giving misleading testimony, Defendants initiated an unlawful condemnation action and prevented a just result in that action.  The Haworths identify as underlying claims those claims for inverse condemnation, nuisance, and tortious interference with economic relations.  A remedy is not otherwise available, the Haworths contend, for two reasons.  First, Defendants' concealment prevented the Haworths from pursuing adequate tort claims, which claims may now be barred by res

judicata, and the resolution of the condemnation action was inadequate and resulted from official

acts of concealment.  Second, the concealment caused the Haworths to suffer damages in excess of

the damages cap set forth in the Oregon Tort Claims Act.  Finally, the Haworths contend that they

are without a state court remedy because, as the record demonstrates, the judgment received in state

court was inadequate to address the extent of their claims and damages against Defendants.

Defendants respond that a denial of access to courts claim should be premised on a genuine

lost opportunity, which the Haworths cannot establish here.  First, this claim depends on the

concealment of the executive session tapes, but the tapes were withheld based on a legitimate claim

of privilege and, in any event, their content is currently in the record before the court.  Thus, unlike

the situation in *Delew v. Wagner*, 143 F.3d 1219 (9th Cir. 1998), cited by the Haworths, the evidence

is  not  permanently  unavailable.    Furthermore,  the  Haworths  cannot  prove  an  underlying

constitutional violation or claim in tort and the assertion that they were damaged is premised on the

notion  that  the  abandonment  damages  they  were  awarded  in  the  condemnation  action  were

inadequate, a claim that the Haworths cannot substantiate.

The Haworths' denial of access to courts claim fails for several reasons.  First, the claims that

are alleged as the underlying basis for the denial of access claim were not properly before the state

court and, thus, need not have been resolved at that time.  Second, those claims are currently before

this court and their consideration is not precluded by the previous state court proceedings.  And, as

Defendants point out, the evidence that was allegedly withheld is currently before the court.  Third,

the Haworths have not identified the specific damages to which they are entitled that will not be

adequately addressed in the current action.  They suggest that there were additional costs and

attorney fees associated with the condemnation action that accrued as a direct result of Defendants'

failure to produce the executive session tapes, but they have neither produced evidence to support this contention nor articulated a plausible basis upon which the court could conclude that such fees and costs exist or were genuinely unavailable after reinstatement of the condemnation action. For these reasons, this claim should be dismissed on summary judgment.

IV.   Section 1983 Claim – Qualified Immunity

Government officials may assert the defense of qualified immunity, which bars the officials' liability under specific circumstances. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). A government official performing a discretionary function is entitled to qualified immunity so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (9th Cir. 1982).

The Supreme Court set forth the standard for qualified immunity in *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001). A government official is entitled to qualified immunity unless his conduct both violated a constitutional right and the constitutional right was clearly defined such that "it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Id.* at 201-202.[2] To overcome the *Saucier* standard and defeat qualified immunity, the plaintiff cannot rely on conclusory allegations and must allege particular facts. *See Backlund v.*

_____

[2] In *Saucier*, the Supreme Court announced a two-step sequence for resolving qualified immunity claims that required courts to first decide whether a plaintiff had made out a claim of constitutional violation and then, only if plaintiff satisfied that first step, decide whether the constitutional right at issue was "clearly established. 533 U.S. at 201. In *Pearson v. Callahan*, __ U.S. __, 129 S. Ct. 808 (2009), the Supreme Court held that "the *Saucier* procedure should not be regarded as an inflexible requirement" and that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson*, 129 S. Ct. at 813, 818. The Court acknowledged that the lower courts retained the full discretion to decide whether to apply the *Saucier* procedure. *Pearson*, 129 S. Ct. at 821.

*Barnhart*, 778 F.2d 1386, 1389 (9th Cir. 1985) ("*Harlow, Davis,* and *Mitchell* make it clear that, to

survive summary judgment, a plaintiff must offer more than general conclusory allegations that the

defendant violated his *First* or *Fourteenth Amendment* rights. . . .  In other words, the plaintiff must

show that *the particular facts* of his case support a claim of clearly established right." (emphasis in

original)).  The standard for whether a right is "clearly established" differs from the standard referred

to in the due process clause:

> While the right to due process is "clearly established" by the Due Process Clause, this
> level of generality was not intended to satisfy the qualified immunity standard. The
> right the official is alleged to have violated must be made specific in regard to the
> kind of action complained of for the constitutional right at issue to have been clearly
> established.  "The contours of the right must be sufficiently clear that a reasonable
> official would understand that what he is doing violates that right."  While the very
> action in question need not previously have been held to be unlawful, in the light of
> pre-existing law the unlawfulness must be apparent.

*Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1101 (9th Cir. 1995) (quoting

*Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)) (internal citations omitted).

This burden is originally on the plaintiff but, if met, the burden shifts to the government

official to "prove that their conduct was reasonable even though it might have violated constitutional

standards."  *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991) (quoting *Baker v.

Racansky*, 887 F.2d 183, 185 (9th Cir. 1989) and citing *Benigni v. City of Hemet*, 879 F.2d 472, 479-

480 (9th Cir. 1988)).

The law regarding governmental deprivations of personal property is well-established.  To

the extent that the specific procedures required to pursue condemnation may not be widely known,

where a governmental entity seeks to exercise its power of eminent domain, it is incumbent upon that

entity to carefully observe its requirements.  Furthermore, it is clearly established that in exercising

eminent domain the entity must act in the public interest and in good faith.  As the Haworths point out, in the relevant period, it was clearly established that an unreasonable delay or unreasonable conduct in the course of a condemnation action may give rise to a claim for condemnation blight. Furthermore, the procedures required to pursue condemnation are also clearly established by Oregon statute.  It is not sufficient for a public entity exercising its power to condemn to claim that it was not aware of the required procedures.

Here, there is ample evidence to support a question of fact whether Defendants violated the Haworths' clearly established rights, of which a reasonable person should have been aware. Accordingly, Defendants are not entitled to qualified immunity and should not be shielded from liability on that basis.

V.    Taking of Private Property

Both parties move for summary judgment on the takings claim.  The Haworths contend that they are entitled to compensation as a result of the City's unreasonable behavior and the substantial delay of the condemnation action.  In particular, they argue that Defendants' conduct both expressly and impliedly discouraged the Haworths from full use of their property in income-generating pursuits.  Defendants also failed to inform the Haworths that they did not intend to pursue condemnation, as early as the time of the dismissal of the condemnation action.  Furthermore, they refused to participate in mediation and rejected a donation of seventy acres, demonstrating a lack of good faith. Finally, Defendants resisted the Haworths' offer to collect attorney fees and costs, further delaying a final resolution of the matter.  The takings analysis encompasses three of the Haworths' claims, namely that there was an unconstitutional taking, a claim for inverse condemnation, and the nuisance claim, as explained below.

A.     State Law

The Oregon Constitution proscribes government takings without compensation and states: "Private property shall not be taken for public use . . . without just compensation . . . ." OR. CONST. Art. I, Sec. 18.  With regard to physical takings of private property, "Oregon law is identical to Fifth Amendment 'physical' takings law." *Hoeck v. City of Portland*, 57 F.3d 781, 787 (9th Cir. 1995) (citing *Ferguson v. City of Mill City*, 120 Or. App. 210, 207 (1993)).  With regard to regulatory takings, however, Oregon law provides less protection to property owners than that protection provided by the Fifth Amendment of the United States Constitution.  *Id.* at 788.

Inverse condemnation occurs when property is taken by the government, though no condemnation actually takes place and no compensation is paid.  This occurs, under Oregon law, "when there is 'a destruction, restriction or interruption of the necessary use and enjoyment of [the] property of a person for a public purpose.  Most cases boil this definition down to a test of whether there has been a 'substantial' interference with property rights.'"  *State of Oregon v. Hewett Professional Group*, 321 Or. 118, 131-132, 895 P.2d 755 (1995) (quoting *Hawkins v. City of La Grande*, 315 Or. 57, 68, 843 P.2d 400 (1992)).  Where condemnation proceedings are the source of the interference, this has been referred to as "condemnation blight" which "occurs when the actions of the government reduce the value of the property before the actual taking."  *Id*. at 134.

B.     Federal Law

The United States Constitution prohibits the taking of private property by the government without just compensation.  *See* U.S. CONST. amend. V (". . . nor shall private property be taken for public use, without just compensation.").  Application of this principle to a physical taking is fairly straightforward.  "When the government physically takes possession of an interest in property for

some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." *Tahoe-Sierra Preservation Counsel v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002). By contrast, the Supreme Court has characterized analysis of regulatory takings by government as "essentially ad hoc, factual inquiries . . . ." *Penn Central v. New York City*, 438 U.S. 104, 124 (1978). The Court gave further guidance as to such inquiries: "The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action." *Id.* (internal citation omitted).

The Supreme Court addressed whether "precondemnation activities constitute a taking" in *Agins v. Tiburon*, 447 U.S. 255 (1980), *abrogated on other grounds, Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 532 (2005). In *Agins*, the plaintiffs argued that, during the pendency of the condemnation action, their ability to sell their property was limited and its value diminished. Because the municipality acted in good faith, and in spite of the fact that the condemnation action was later abandoned, the Court concluded that no taking had occurred. The Court wrote: "Even if the appellants' ability to sell their property was limited during the pendency of the condemnation proceeding, the appellants were free to sell or develop their property when the proceedings ended. Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a "taking" in the constitutional sense.'" *Agins*, 447 U.S. at 263 n.9 (quoting *Danforth v. United States*, 308 U.S. 271, 285 (1939)).

Further guidance was provided by the Ninth Circuit in *Thompson v. Tualatin Hills Park & Recreation Dist.*, 701 F.2d 99 (9th Cir. 1983). There, a recreational district filed a condemnation

action seeking to acquire the plaintiff's property.  After this action was filed, the plaintiff allowed an option to buy adjacent property to expire.  The recreational district abandoned its condemnation action a little over a year after the filing.  The court determined that the abandoned condemnation action did not constitute a taking, and wrote:  "In the present case . . . the condemnation proceeding was pending only for approximately a year, and there is no charge of lack of diligence, bad faith, or other unreasonable or oppressive activity in initiating or abandoning the proceeding."  *Id.* at 101. The court noted that the cases that the plaintiff relied upon "involved long delayed or protracted acquisition proceedings and other governmental activity resulting in direct and substantial interference with plaintiff's use and enjoyment of his property and significant and foreseeable impairment of its market value."  *Id*.  Thus, unreasonable delays in the condemnation process or abandonment of a condemnation action may result in an unconstitutional taking.  *See Martino v. Santa Clara Valley Water Dist.*, 703 F.2d 1141, 1147 (9th Cir. 1983) ("A 'taking' may be found without any physical invasion where, for example, 'a public entity acting in furtherance of a public project directly and substantially interferes with property rights and thereby significantly impairs the value of property. . . .'" (quoting *Richmond Elks' Hall Assoc. v. Richmond Redevelopment Agency*, 561 F.2d 1327 (9th Cir. 1977))).

    *C.*    *Analysis*

       The Haworths contend that, during the pendency of the City's condemnation action, their ability to exercise their property rights suffered substantial interference, and that the delay in condemnation proceedings coupled with the City's unreasonable behavior is sufficient to establish a taking.

       Here, the Haworths allege that the City's conduct prevented them from using their property

to its fullest extent and that the City was otherwise unreasonable and acted in bad faith in prosecuting the condemnation action.  Although Hally Haworth testified that the City told him to go ahead and plant his nursery crops, he did not do so because he did not trust the City's representations and felt that city officials gave him mixed messages.  However, there is no evidence that the City directly prevented the Haworths from the use and enjoyment of their property.  The Haworths' subjective belief that they should not plant nursery crops because they did not trust representations of city officials is insufficient evidence of inverse condemnation to justify summary judgment in their favor. The Haworths have not established, as a matter of law, that the City acted unreasonably or with bad faith such that their use and enjoyment was significantly and foreseeably impaired.   This determination is for the factfinder.

Defendants also have failed to establish, as a matter of law, that the City did *not* act unreasonably or in bad faith.  The record evidence taken in the light most favorable to the Haworths precludes a finding that Defendants are entitled to summary judgment on this claim.  The Haworths outbid the City in the initial purchase of the property; in the executive session, the content of the resolution was uncertain and multiple uses for the property were discussed showing a general rather than a specific need; condemnation was characterized as a "threat" or a "big stick" to be used against the Haworths; the Haworths did not trust the representations of Defendant and did not, in fact, make full use of the property; the Haworths made an unconditional offer to donate seventy acres to the City if the City would leave them alone; and defense counsel made statements, on the record, that the condemnation action was not proper.  There is a least a genuine issue of material fact as to whether Defendants' conduct with regard to condemnation of the Haworths' property was lawful and, thus, Defendants' motion for summary judgment on this claim should also be denied.

FINDINGS AND RECOMMENDATION        29                                    {KPR}

<u>VI.</u>    <u>Inverse Condemnation, Intentional Interference with Economic Relations, and Nuisance</u>

      *A.    Inverse Condemnation*

The Haworths and the Defendants both move for summary judgment on this claim. This claim is addressed above in the unconstitutional takings section. For the reasons stated in that section, summary judgment should be denied.

      *B.    Intentional Interference with Economic Relations*

The Haworths and the City both move for summary judgment on this claim. The six elements giving rise to a claim for intentional interference with economic relations ("IIER") are: "'(1) the existence of a professional or business relationship . . . , (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages.'" *Douglas Medical Center, LLC v. Mercy Medical Center*, 203 Or. App. 619, 630, 125 P.3d 1281 (2006) (quoting *McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995)). The Haworths seek only partial summary judgment on this claim, that is, they seek a finding of liability, with damages to be determined later by a finder of fact.

First, the plaintiff must establish the existence of a professional or business relationship that was interfered with by the accused party. The Haworths argue that the purchase of the subject property for the purpose of expanding their nursery operation establishes the existence of a business relationship, and they claim that this fact is undisputed. Defendants respond that the initiation of condemnation proceedings does not create a business relationship and is not the type of relationship contemplated by this tort. Defendants cite *Fox v. Country Mutual Ins. Co.*, 169 Or. App. 54 (2000), wherein the court determined that an interest in a civil lawsuit was not a basis for a claim of IIER.

Although the tort has been recognized with respect to some noncommercial relationships, the court declined to extend it to prospective interests in lawsuits because, one, the tort is meant to "protect the integrity of, and expectancies in, voluntarily-created economic relationships[,]" *id.* at 74, and, two, "courts have not historically afforded prospective interests in the outcome of civil litigation the same level of common-law protection extended to prospective contracts or prospective inheritances." *Id.* at 75.

Here, the interest claimed by the Haworths is in the productive use of their property, not in the outcome of the condemnation proceedings, so this case is only applicable in the general sense. Nonetheless, the court is not persuaded that the Haworths' relationship with their property is a "business relationship" as contemplated by this cause of action. The Haworths' claim is premised on their inability to use and enjoy their property as a result of pending condemnation proceedings and an interruption in their production of income. The third element of this tort refers to a third party, which implies that there must also be a "second party." The Haworths simply have not established the existence of such an entity or a professional or business relationship with such entity.

Second, for purposes of this tort, the interfering actor must have either the intent to interfere or must "know[] that the interference is substantially certain to occur from his action and is a necessary consequence thereof[.]" *Straube v. Larson*, 287 Or. 357, 361 (1979). The Haworths claim that the City demonstrated the requisite intent in knowing that their property was for their nursery operation and that condemnation was substantially certain to interfere with it producing income. Defendants respond that they advised the Haworths to use their property for its intended use and the Haworths' failure to do so was of their own volition. There is a genuine issue of material fact as to whether Defendants discouraged the Haworths from using their property in the manner for which

it was intended.  The Haworths' blanket statement that the condemnation proceeding alone was sufficient to interfere with the economic utility of the subject property is simply too broad and does not acknowledge the City's right to exercise its power of eminent domain.

Third, as discussed above, the interfering party must be a third party.  The Haworths failed to establish a relationship, with respect to the first element, and therefore cannot establish that Defendants were third parties to a relationship.

Fourth, the interference must be the result of improper means or for an improper purpose. The Haworths argue that Defendants were deceitful and improperly initiated a condemnation action against them, satisfying this element.  They further argue that the Washington County Circuit Court's finding that the condemnation action was baseless is conclusive proof of the improper action. Defendants respond that initiation of a condemnation proceeding is not improper and such a finding would be contrary to well-established law entitling government to exercise its power of eminent domain.  Furthermore, Defendants argue that the Haworths must establish that they violated some objective rule or standard, as required by *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or. 487 (1999).  In *Northwest Natural*, it was alleged that the defendant intentionally interfered with the plaintiff's economic relations when it lawfully filed a lien against the plaintiff's business proceeds, which resulted in the plaintiff's lender closing the plaintiff's line of credit.  The court wrote, with respect to the improper means or purpose prong:

> Thus, if liability in tort is to be based on an actor's purpose, then the purpose must be to inflict injury on the plaintiff "as such."  And, if liability in tort is based on an actor's means, then the means must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession.

*Id*. at 498.  Therefore, the lawful commencement of a condemnation action, without more, cannot

provide the basis for such a claim.  The parties dispute whether Defendants' conduct amounts to "more" than the lawful initiation of such action and, based on the record before the court, there is a genuine issue of material fact on this point.

Finally, there must be a causal connection between the alleged interference and damage to the relationship.  Here, there is a genuine issue of material fact as to whether Defendants' caused the Haworths to cease planting activities on the subject property.

As explained above, however, the Haworths cannot present a genuine factual issue as to the existence of a business relationships and, therefore, Defendants are entitled to summary judgment on this claim.

C.    Nuisance

The Haworths allege a claim for private nuisance resulting from Defendants' conduct and the City moves for summary judgment on this claim.  Nuisance exists where "there is a substantial and unreasonable interference with the use and enjoyment of land."  *Smith v. Wallowa County*, 145 Or. App. 341, 346, 929 P.2d 1100 (1996).  This standard is identical to the standard for inverse condemnation and the claim indistinct from the Haworths' claims arising under the takings doctrine.

The Oregon Supreme Court wrote, in *Thornburg v. Port of Portland*, 233 Or. 178, 376 P.2d 100 (1962):

> Therefore, unless there is some reason of public policy which bars compensation in cases of governmental nuisance as a matter of law, there is a question, in each case, as a matter of fact, whether or not the governmental activity complained of has resulted in so substantial an interference with use and enjoyment of one's land as to amount to a taking of private property for public use.

*Id*. at 190.  Essentially, a nuisance caused by governmental action is analyzed as a taking under the doctrine of inverse condemnation.  Governmental interference that does not rise to the level of a

taking is not otherwise actionable under the doctrine of nuisance.  This claim is, thus, identical to

the Haworths' inverse condemnation claim and will not be analyzed separately here.  The City's

motion on this claim should be granted.

     D.     *Wrongful Initiation of Civil Proceedings*

     The Haworths allege that the City wrongfully initiated civil proceedings against them and the

City moves for summary judgment on this claim as well.

> "Under Oregon law, the elements of a claim for wrongful initiation of a civil
> proceeding are:
>
> '(1) The commencement and prosecution by the defendant of a
> judicial proceeding against the plaintiff; (2) The termination of the
> proceeding in the plaintiff's favor; (3) The absence of probable cause
> to prosecute the action; (4) The existence of malice or as is
> sometimes stated, the existence of a primary purpose other than that
> of securing an adjudication of the claim; and (5) Damages.'"

*Portland Trailer & Equipment, Inc. v. A-1 Freeman Moving & Storage, Inc.*, 182 Or. App. 347, 351

(2002) (quoting *Alvarez v. Retail Credit Ass'n*, 234 Or. 255, 259-60, 381 P.2d 499 (1963)).  The City

argues that the Haworths cannot establish three of the five elements of this claim and, thus, summary

judgment should be granted in the City's favor.

     First, the City contends that, for purposes of this claim, it had "probable cause" to initiate the

condemnation proceedings.  "For purposes of a claim of wrongful initiation of civil proceedings,

'probable cause' means that the person initiating the civil action reasonably believes that he or she

has a good chance of establishing his claim to the court's satisfaction."  *Gunter v. Guardian Press*

*Found., Inc.*, Case No. 02-6254-HO, 2006 U.S. Dist. LEXIS 34691, at *14 (D. Or. Mar. 28, 2006)

(citing *Erlandson v. Pullen*, 45 Or.App. 467, 475, 608 P.2d 1169 (1980)).  This requires both a

subjective belief that the claim will likely be successful and that the belief be objectively reasonable.

FINDINGS AND RECOMMENDATION     34     {KPR}

*Id*.  The Haworths argue that Judge Gardner deemed the condemnation action objectively unreasonable and the City's attorney admitted that the City lacked a public purpose in taking the Haworths' property.  The City contends that Judge Gardner actually validated their condemnation action in saying that the City had a right to acquire some of the Haworths' property.

The court agrees that there is a genuine issue of material fact as to whether the City subjectively believed that this action would be successful and, if so, whether such a belief was objectively reasonable.  Although the executive session transcript suggests that the City assumed it would be successful in its condemnation action, such belief is not explicit.  And, in a memorandum to Sykes, John Holan gave the condemnation action a sixty-percent chance of success.  Furthermore, based on the City's lack of success in the condemnation action itself, there is a fact question as to whether its belief in the likelihood of its success was objectively reasonable.

Second, the City argues that the Haworths cannot establish malice, or a primary purpose other than the object of the litigation.  In fact, it argues, the Haworths acknowledged that the primary purpose of the condemnation action was to obtain their property, and not some ulterior motive.  The Haworths respond that there is evidence of the City's malicious purpose, either to use the condemnation action as leverage in a negotiation with the Haworths or, through intimidation, to prevent the Haworths from actually purchasing the property in the first place.

The purpose of a condemnation action is to secure public ownership of private property in exchange for just compensation of a property owner.  The Haworths' allegation that the City used the condemnation action to gain leverage in negotiations or pressure them not to purchase the property  from the Zurcher trust is insufficient to establish malice for purposes of this claim.  The City was within its rights to initiate a condemnation action, thereby signaling to the Haworths its

FINDINGS AND RECOMMENDATION          35                              {KPR}

interest in obtaining their property.  That the City hoped that the Haworths would respond to its initiation by  entering negotiations with the City or declining to purchase the property in the first instance does not render the initiation of the condemnation proceedings malicious or unlawful.

Third, the City argues that the Haworths can claim no remaining damages associated with the condemnation action, as they have already recovered fees and costs and have been able to fully use their land throughout the litigation.  The Haworths respond that they are entitled to damages caused by the City during the pendency of the condemnation action, specifically for lost profits from unplanted nursery crops and unleased rental properties.  Because the Haworths cannot establish malice, the court need not reach the issue of damages.  Accordingly, the City's motion for summary judgment on this claim should be granted.

### Conclusion

For the reasons stated the Haworths' motion for summary judgment should be denied in its entirety.  Defendants' motion should be granted as to the claims for denial of access to courts, procedural due process, intentional interference with prospective business advantage, private nuisance, and wrongful initiation of civil proceedings.  Defendants' motion as to the substantive due process and inverse condemnation claims should be denied.

### Scheduling Order

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due April 26, 2011.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and

Recommendation will go under advisement.

DATED this 12th day of April, 2011.


                                         /s/ John V. Acosta
                                         JOHN V. ACOSTA
                              United States Magistrate Judge